407 F.3d 34
 STICHTING TER BEHARTIGING VAN DE BELANGEN VAN OUDAANDEELHOUDERS IN HET KAPITAAL VAN SAYBOLT INTERNATIONAL B.V. (Foundation of the Shareholders' Committee Representing the Former Shareholders of Saybolt International B.V.), Plaintiff-Appellant-Cross-Appellee,
v.
Philippe S.E. SCHREIBER, and Walter, Conston, Alexander & Green P.C., Defendants-Third-Party-Plaintiffs-Appellees-Cross-Appellants,
Dwyer & Collora, LLP, Third-Party-Defendant,
Saybolt LP, f/k/a/ Saybolt, Inc. and Saybolt North America, Inc., Defendants.
 Docket No. 03-9066.
 Docket No. 03-9116.
 Docket No. 03-9120.
 United States Court of Appeals, Second Circuit.
 Argued: September 9, 2004.
 Decided: May 3, 2005.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Norris D. Wolff, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York, NY, for Plaintiff-Appellant-Cross-Appellee (Edward P. Grosz and Anne Katz, on the brief).
 John S. Siffert, Lankler Siffert & Wohl LLP, New York, NY, for Defendant-Third-Party Plaintiff-Appellee-Cross-Appellant Philippe S.E. Schreiber (Daniel E. Reynolds and Lee Renzin, on the brief).
 David N. Ellenhorn, Proskauer Rose LLP, New York, NY, for Defendant-Third-Party Plaintiff-Appellee-Cross-Appellant Walter, Conston, Alexander & Green P.C. (Tom Stein, on the brief).
 Before: CALABRESI, SACK, and RAGGI, Circuit Judges.
 Judge SACK concurs in the majority opinion and in a separate opinion.
 CALABRESI, Circuit Judge.
 
 
 1
 We find that this case turns on two questions of New York law that are important, recurring, and undecided: 1) whether New Jersey or New York law applies to the question of whether the plaintiff's assignment of claim is valid, and 2) whether an apparent authority relationship existed between the two defendants. We therefore certify those questions to the New York Court of Appeals.
 
 I. Background
 
 2
 This legal malpractice action, which has been pending in federal court for five years, returns to us after proceedings on remand to the district court (Rakoff, J.), following an appeal in which we vacated the grant of summary judgment to the Defendants-Third-Party-Plaintiffs-Appellees-Cross-Appellants Philippe S.E. Schreiber ("Schreiber") and the law firm of Walter, Conston, Alexander & Green P.C. ("Walter, Conston"). See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 327 F.3d 173 (2d Cir.2003) ("Stichting I"). On remand, the district court dismissed the action, deciding that, under applicable state law, which it determined to be that of New Jersey, Plaintiff-Appellant Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt International B.V. (Foundation of the Shareholders' Committee Representing the Former Shareholders of Saybolt International B.V.) ("Stichting") was not the real party in interest and so could not bring suit.[1] All parties now appeal.
 
 
 3
 The events giving rise to the instant litigation are described in Stichting I, 327 F.3d at 176-79, familiarity with which is assumed. Only those facts that are necessary as background to this decision will be set forth here.
 
 
 THE SAYBOLT ENTITIES
 
 
 4
 This case arises out of a 1995 transaction entered into by Saybolt International, B.V. ("Saybolt BV"), a Dutch corporation, and its New Jersey-domiciled subsidiaries, Saybolt, Inc. and its parent holding company Saybolt North America, Inc. ("Saybolt NA"), in order to acquire land in Panama.[2] As Stichting I sets forth in some detail, in the course of that transaction Saybolt paid a $50,000 bribe to Panamanian officials, in violation of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, et seq. ("FCPA"). Saybolt, Inc. and Saybolt NA, as well as two principals of the companies, David Mead ("Mead") and Frerik Pluimers ("Pluimers") were subsequently indicted on charges in connection with violations of the FCPA. The Saybolt entities, through their guilty plea, and Mead, following trial, were convicted; Pluimers, a Dutch citizen, never appeared in the United States to answer to the charges.
 
 
 SCHREIBER'S RELATIONSHIP WITH SAYBOLT AND WALTER, CONSTON
 
 
 5
 Stichting alleges that Saybolt made the Panamanian bribe on the basis of negligent legal advice from Schreiber, who had been retained both as a legal advisor to the corporation and as an outside director to Saybolt NA. According to the complaint, the Saybolt decision-makers who authorized the bribe would not have done so if they had not been told by Schreiber that the transaction could be structured so as not to run afoul of the FCPA.
 
 
 6
 Schreiber was, at all times relevant to this action, an attorney licensed in New York who was affiliated in an of-counsel capacity with the New York law firm of Walter, Conston, Alexander & Green P.C. ("Walter, Conston") and who also maintained a private practice out of his home in Connecticut. For a number of years prior to entering into an of-counsel relationship with Walter, Conston, Schreiber had been a partner with the firm. In 1988, Schreiber relinquished his partnership and he and Walter, Conston entered into an agreement ("the Of-Counsel Agreement") that specified the terms upon which he would remain affiliated with the firm. The Of-Counsel Agreement stated that Schreiber could maintain an independent practice in Fairfield, Connecticut involving "handling business negotiations on behalf of, rendering general business advice and doing some legal work of a specific nature for" personal business clients. It also authorized Schreiber to "use the title `of counsel'... as it directly relates to ... [his] client development activity on behalf of [him]self."
 
 
 7
 From May 1988 to December 1998 Schreiber's of-counsel affiliation with Walter, Conston was publicized by the firm in several ways, including firm letterhead and firm listings in legal directories. Schreiber also, in his personal practice, advertised his affiliation with Walter, Conston, in various ways, including by stating on his letterhead, fax sheets, and invoices that he was of counsel to the firm. During all times relevant to this action Schreiber maintained bar membership solely in the state of New York, and publicly listed Walter, Conston as the location of his only legal practice.
 
 
 8
 Schreiber began working for Saybolt NA and Saybolt, Inc. in October 1994. Prior to being hired, Schreiber met with Mead, who at the time was an officer of Saybolt, Inc., Saybolt NA and Saybolt BV. At that time, Schreiber gave Mead a copy of Schreiber's "Summary of Background and Services" ("Summary of Services"), which stated, inter alia, that Schreiber "practice[d] independently and also serve[d] as counsel to the law firm of Walter, Conston, Alexander & Green." It set forth Schreiber's fees, which, according to the summary of services, were charged for specific services on an hourly basis "at a substantial discount from those charged by Walter, Conston for [his] services," resulting "in considerable savings for [his] clients." The summary of services was printed on Schreiber's personal letterhead, which bore both Schreiber's Connecticut address and a description of Schreiber's of-counsel affiliation with Walter, Conston. In addition to giving the summary of services to Saybolt personnel, Schreiber also expressly mentioned his affiliation with Walter, Conston in the course of interviews with Mead and others.
 
 
 9
 Walter, Conston apparently was unaware of Schreiber's specific affiliation with Saybolt; the firm did not open a file or assign a client number for any Saybolt work, and Saybolt never made any payment for Schreiber's work to Walter, Conston or at the Walter, Conston rate. Schreiber did, however, utilize the Walter, Conston offices for Saybolt work. He held meetings with Saybolt representatives at Walter, Conston on at least three occasions, and occasionally received communications from Saybolt at Walter, Conston. ut it does not appear from the record that any of these contacts with the Walter, Conston offices related specifically to the Panamanian transaction that gave rise to this litigation.
 
 
 SCHREIBER'S ROLE IN THE TRANSACTION
 
 
 10
 During the mid-1990s Saybolt became interested in acquiring land to build a new office and laboratory facility in Panama. Upon investigating this prospect, Saybolt was informed that in order to obtain the land it would be expected to pay a $50,000 bribe to certain Panamanian officials.
 
 
 11
 The interest in acquiring property in Panama, and the fact of the requested bribe, were discussed at a November 9, 1995 meeting of the Board of Directors of Saybolt NA. The meeting took place at the Saybolt offices in New Jersey and was attended by, among others, Schreiber, Mead, Pluimers, who was at that time President and Chief Executive Officer of Saybolt BV, and Steven Dunlop ("Dunlop"), an employee of Saybolt, Inc. Several days later, Schreiber, Dunlop, and others attended another meeting at the New Jersey office, at which the Panamanian transaction was discussed. The record indicates that at one of the two November meetings, Schreiber stated to those present that the payment of a bribe by a United States company would violate the FCPA.
 
 
 12
 According to Stichting, however, in the weeks that followed the November meetings Schreiber advised Saybolt officials in a manner that caused the company, in reliance on Schreiber's expertise, to deliver the illegal bribe. In particular, Stichting alleges that Schreiber knew that Saybolt believed that the bribe would not violate the FCPA if the bribe was channeled through the Dutch parent corporation and, despite being consulted by Saybolt regarding such a transaction, did not provide competent legal advice to deter the company from proceeding with it. Schreiber discussed the transaction by telephone with Saybolt employees Mead and Dunlop in December 1995. The record indicates that during each of these calls Schreiber was located at his office in Connecticut, and Mead and Dunlop were located either in New Jersey or, on one occasion, in Washington, D.C.
 
 
 13
 The final decision to pay the bribe was made some time in December 1995. The record indicates that Pluimers had the final authority on the issue, and made the decision in consultation with Mead, who gave direction that the payment be made. On December 17, 1995 Dunlop traveled to Panama in order to arrange the bribe. On December 21, 1995 Saybolt BV wired $50,000 from the Netherlands to a bank account controlled by an affiliate in Panama, and Dunlop directed an employee of the affiliate to deliver the payment to an intermediary of the Panamanian official who was to receive the bribe.
 
 
 CRIMINAL PROCEEDINGS AND THE SALE OF SAYBOLT
 
 
 14
 On November 20, 1996, in connection with an (unrelated) investigation of Saybolt by the Environmental Protection Agency and the Massachusetts United States Attorney, a search warrant was executed on Saybolt's offices in New Jersey. Among the materials seized was substantial evidence pertaining to the Panamanian payment.
 
 
 15
 Shortly thereafter, in May 1997, Core Laboratories, N.V. ("Core"), a Dutch corporation, purchased Saybolt BV and Saybolt NA. Pursuant to the purchase agreement, Saybolt BV's former shareholders placed $6 million of the $60-million purchase price in escrow for the purpose of paying fines, penalties, and expenses for which Core, on behalf of itself and its acquired Saybolt subsidiaries, would be liable in connection with the Panamanian transaction. In exchange, Core, on behalf of itself and its Saybolt subsidiaries, assigned to the Saybolt BV shareholders all rights, claims, causes of action, or theories of recovery against Schreiber and Walter, Conston relating to these same events.
 
 
 16
 In the same time period, Schreiber sought and obtained immunity for himself in exchange for Grand Jury testimony with respect to the Panamanian bribe. In April 1998 Mead and Pluimers were indicted in the District of New Jersey on two counts of violating and conspiring to violate the FCPA. Shortly thereafter, Saybolt NA and Saybolt, Inc. were charged with the same, and in December 1998 the Saybolt entities pled guilty to the charges.
 
 
 17
 Mead went to trial on the charges in the New Jersey district court, and was convicted in October 1998. The jury specifically found that Mead had violated the FCPA "corruptly and willfully," and that he did not "actually believe[] that the [Panamanian bribe] was legal." Mead was sentenced to four months' imprisonment and paid a $20,000 fine.
 
 
 THE DISTRICT COURT PROCEEDINGS
 
 
 18
 Subsequently, Saybolt BV's former shareholders—assignees of Core—made over their claims to Stichting, a Dutch corporation organized specifically for the purpose of representing the Saybolt shareholders. On November 18, 1999, Stichting filed the instant action seeking damages of upward of $4 million against Schreiber and Walter, Conston on the basis of defendants' alleged legal malpractice, breach of fiduciary duty, and breach of contract.
 
 
 19
 On January 21, 2000 Schreiber and Walter, Conston both moved to dismiss the complaint on the ground that Stichting was not the real party in interest under Federal Rule of Civil Procedure 17(a). The theory of the defendants' motion was that Stichting functioned merely as a "collection agent" for the individual shareholders, and hence that the assignment of claim was a collusive device to create diversity jurisdiction. The defendants argued that the complaint "should be dismissed unless the former Saybolt B.V. shareholders are substituted as plaintiffs." The motion did not raise any question as to the legality, under New Jersey or any other state law, of Core's and the shareholders' assignments.
 
 
 20
 On February 25, 2000 the district court ruled that, notwithstanding the defendants' invocation of Fed.R.Civ.P. 17, the motion was, in fact, a challenge to subject matter jurisdiction, and therefore Rule 17 and its procedures for curing real party in interest problems were not applicable to the matter. And, finding no collusive attempt to create diversity jurisdiction, the district court thereafter denied, with prejudice, the motion to dismiss under Rule 17.
 
 
 21
 Subsequent to that decision, Schreiber and Walter, Conston moved for summary judgment. That motion, which is the subject of our opinion in Stichting I, was premised on the defendants' contention that the guilty plea of Saybolt NA and Saybolt, Inc., and the conviction of Mead, collaterally estopped Stichting from arguing that Saybolt and its principals actually relied upon the advice of Schreiber. The district court granted summary judgment, which we vacated on appeal in Stichting I.
 
 
 22
 Following this court's remand of the action, the district court permitted motions for summary judgment on any grounds not already decided. Thereafter Schreiber and Walter, Conston moved to dismiss all claims for lack of standing, arguing that 1) New Jersey law governed the instant action, and 2) under New Jersey law Saybolt's claims were unassignable, such that 3) Stichting had no valid claim to assert. Schreiber and Walter, Conston also each moved separately for summary judgment on the issues of malpractice liability and vicarious liability, respectively.
 
 
 23
 At oral argument on the motions, the district court agreed with defendants that New Jersey law governed the issue of assignability of the action, but concluded that it did not at that time need to reach the issue of whether, under New Jersey law, the assignments were invalid. Instead, the court determined that, assuming arguendo that the assignments were invalid and that therefore Saybolt, and not Stichting, was the real party in interest, Stichting was entitled, under Fed.R.Civ.P. 17(a), to cure this defect by ratification by, or substitution or joinder of, Saybolt. Therefore, on July 22, 2003, the court granted defendants' motion to dismiss for lack of standing, contingent upon Stichting, within two weeks' time, "cur[ing] the defect by one of the means listed in [Rule 17(a)]." The court also directed further briefing on the issue of whether ratification by the real party in interest was, under the circumstances, sufficient to cure the standing problem raised by defendants. Finally, the court denied Schreiber's and Walter, Conston's individual motions for summary judgment.
 
 
 24
 Following the supplemental briefing described above, the district court, on July 29, 2003, ruled that New Jersey law prohibited assignment of legal malpractice claims such as the one brought by Stichting, and that therefore Stichting was not the real party in interest. The court further held that ratification of the action would not rectify the problem, because such a procedure would circumvent New Jersey's substantive law prohibiting such assignments. The court therefore directed that "Saybolt Inc."[3] be either joined or substituted as a party by no later than August 4, 2003.
 
 
 25
 On August 4, 2003 Stichting filed a second amended complaint joining Saybolt, Inc. and Saybolt N.A. as nominal defendants. Stichting also submitted to the district court a Certification of Ratification and Objection to Joinder or Substitution ("the Certification"), executed by general counsel for Saybolt, Inc. and Saybolt NA. The Certification confirmed that the Saybolt entities considered themselves bound by the original assignment of claim to the Saybolt BV shareholders, and it ratified Stichting's right to bring this action in its own name. The Certification further stated that the Saybolt entities would not challenge the final judgment in this case, and that they waived their right to bring any claim against Schreiber and Walter, Conston in connection with events underlying this action. The Saybolt entities declined, however, to participate as plaintiffs in the instant litigation, stating the following:
 
 
 26
 I understand that this Court has ruled that this case shall be dismissed unless Saybolt is joined as a party plaintiff or is substituted for ... Stichting in this action. In light of the facts ... Saybolt does not have an interest in such case and accordingly respectfully declines to appear in this action as a plaintiff. In Saybolt's view, Saybolt has already been compensated by the former shareholders of Saybolt International B.V. for any financial harm that it might have sustained as a result of defendants' alleged malpractice.
 
 
 27
 Forcing Saybolt to appear in this action at this time could subject Saybolt to the costs and vagaries of litigation that Saybolt sought to avoid by entering into the Memorandum of Agreement with the former shareholders. Further, Saybolt does not desire to pursue, in effect, a second recovery against defendants, particularly since Saybolt has already agreed under the Memorandum of Agreement that the former shareholders of Saybolt International B.V. would be entitled to recover on their own behalf damages arising out of defendants' malpractice. Finally, given that Saybolt has transferred to the former shareholders of Saybolt International B.V. all of its interest in any such malpractice claim and given that Saybolt has no ongoing relationship with such former shareholders group, Saybolt has no reason, legal or moral or otherwise, to cooperate with or assist such shareholders in their effort to recover such damages.
 
 
 28
 On August 28, 2003 the district court held that Stichting's joinder of the Saybolt entities as defendants had not cured the real party in interest problem for essentially identical reasons to those it had stated in its July 29 opinion. The court therefore dismissed the second amended complaint in its entirety.[4] The instant appeal ensued.
 
 DISCUSSION
 I. Choice of Law and Real Party in Interest
 A. Standard of Review
 
 29
 Our review of the district court's dismissal of the action for lack of standing is de novo. Kaliski v. Bacot (In re Bank of New York Derivative Litigation), 320 F.3d 291, 297 (2d Cir.2003). Our review is also de novo with respect to the district court's determination of which state's law governs this action, and with respect to its interpretation and application of the relevant state law. White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir.2000); Bank of New York v. Amoco Oil Co., 35 F.3d 643, 650 (2d Cir.1994) (citing Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991)).
 
 
 30
 Regarding the district court's decision not to allow the ratification by or joinder of the Saybolt entities pursuant to Fed.R.Civ.P. 17(a), this circuit appears never to have stated the proper standard of review for a district court's application of the curative procedures set forth in that rule. But see Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 20 (2d Cir.1997) ("A Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal ...."); id. ("[T]he district court retains some discretion to dismiss an action where there was no semblance of any reasonable basis for the naming of an incorrect party...."). Other circuits that have addressed the question have uniformly held that abuse of discretion is the proper standard of review. See Esposito v. United States, 368 F.3d 1271, 1273 (10th Cir.2004); Wieburg v. GTE Southwest Inc., 272 F.3d 302, 308-09 (5th Cir.2001); ICON Group, Inc. v. Mahogany Run Development Corp., 829 F.2d 473, 476 (3d Cir.1987). Today we join these circuits in holding that a district court's decision whether to dismiss pursuant to Rule 17(a) is reviewed for abuse of discretion.
 
 
 31
 B. The Choice of Law Issue is Dispositive of This Action
 
 
 32
 As a threshold matter, Stichting puts forth three reasons why the choice of law issue need not be resolved in order for this court to conclude that the district court erred in dismissing Stichting's claims for lack of standing. First, Stichting argues that the district court's consideration of the defendants' motion on this ground was barred either by judicial estoppel, law of the case, or waiver. Second, Stichting claims that the district court erred in concluding that New Jersey law barred assignment of this action. Third, Stichting contends that even assuming that New Jersey law did bar assignment of Saybolt's claims, the district court erred in not allowing Stichting to employ the mechanisms set forth in Fed.R.Civ.P. 17(a) to cure the real party in interest problems. Any one of these arguments, if successful, would be dispositive of this appeal, and the choice of law issue would then not require resolution. We conclude, however, that none of them is meritorious.
 
 
 33
 1. Law of the Case, Estoppel, Admission, and Waiver
 
 
 34
 Stichting gives four reasons why Schreiber and Walter, Conston were barred from arguing, in the motion at issue on this appeal, that the assignment of the claim to Stichting was invalid. First, Stichting states that the validity of Stichting's assignment has been established as law of the case, both by the district court's denial of the first motion to dismiss, and by this court's statement in Stichting I that "Saybolt International's former shareholders assigned their legal malpractice causes of action to the plaintiff." Stichting I, 327 F.3d at 178. Second, Stichting argues that Schreiber and Walter, Conston are judicially estopped from contesting the validity of Stichting's assignment because Schreiber and Walter, Conston's initial motion to dismiss had contended that the Saybolt BV shareholders—who themselves had received their interest by assignment —were the real parties in interest. This, Stichting claims, constituted a legal admission by Schreiber and Walter, Conston that assignments of this sort were valid. Third, and relatedly, Stichting asserts that the defendants' statement in their Rule 56.1 filing on the first motion for summary judgment, that Core "assigned to the former Saybolt B.V. shareholders all of Core's" claims, constituted a judicial admission as to the validity of that assignment. Finally, Stichting contends that defendants waived any right to contest its status as the real party in interest by waiting more than three years to raise the issue.
 
 
 35
 As to the first point, our law of the case doctrine "`ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" Field v. United States, 381 F.3d 109, 114 (2d Cir.2004) (quoting United States v. Quintieri, 306 F.3d 1217, 1229 (2d Cir.2002)). We also have stated that a district court's discretion to reconsider its own decisions is limited, at least absent an intervening change of law, to circumstances in which new evidence is available, an error must be corrected, or manifest injustice would otherwise ensue. See Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir.2003).
 
 
 36
 The doctrine is, however, simply not applicable here, because neither the district court nor this court was ever squarely presented with the question of whether the assignments of claims—first to the Saybolt BV shareholders, and then to Stichting— were valid as a matter of substantive state law. Stichting I, which mentioned the assignment only in passing, certainly did not decide the issue. See New England Insurance Co. v. Healthcare Underwriters Mutual Insurance Co., 352 F.3d 599, 606 (2d Cir.2003) (observing that "the law of the case does not extend to issues an appellate court did not address"(internal quotation and citation omitted)). Nor did the district court, which in its decision on the first motion to dismiss treated the issue before it solely as a challenge to the court's diversity jurisdiction, ever rule on whether Stichting, or the Saybolt BV shareholders, were real parties in interest. Indeed, the district court expressly stated that it declined to treat the initial motion to dismiss as raising a Rule 17(a) issue. Therefore, the law of the case presented no barrier to the district court's consideration of the real party in interest issue on remand following Stichting I.
 
 
 37
 As to judicial estoppel, that doctrine applies only in situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced. See Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir.2004). Assuming, arguendo, that Schreiber and Walter, Conston advanced, with respect to the validity of the assignments, a position in their first motion to dismiss that was actually inconsistent with that taken on the current motion, it is clear that the earlier position was never adopted by the district court. Therefore, the requirements for invoking the doctrine of judicial estoppel are not present here.
 
 
 38
 Regarding Stichting's judicial admission argument, we have specified that judicial admissions are "statements of fact rather than legal arguments made to a court." New York State National Organization for Women v. Terry, 159 F.3d 86, 97 n. 7 (2d Cir.1998). For this reason, the statement in Schreiber's Rule 56.1 statement in support of the motion for summary judgment that was the subject of Stichting I, that "Core ... assigned to the former Saybolt B.V. Shareholders all of Core's" claims, cannot be taken as a concession that, under applicable law, the assignment was validly made.
 
 
 39
 Finally, as to waiver, Stichting argues essentially that Schreiber and Walter, Conston were not, after more than three years of litigation in which the validity of Stichting's assignment never was questioned, entitled to raise a real party in interest objection. We note that the district court's determination that no waiver had occurred was made pursuant to its "broad duties in managing the conduct of cases pending before it," and therefore is reviewed only for abuse of discretion. Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 60 (2d Cir.1999); see also United States v. Ziegler Bolt and Parts Co., 111 F.3d 878, 882-83 (Fed.Cir.1997). While, certainly, the motion disputing the validity of Stichting's assignment was filed late in the course of this litigation, the defenses of "no real party in interest" and "no standing" were asserted by both Schreiber and Walter, Conston in their answers to the complaint. Furthermore, the issue was promptly raised in response to the district court's order that, following remand from this court, the parties submit motions on "any grounds" not previously raised, a procedure to which Stichting did not object. This, in itself, distinguishes this case from the only authorities cited by Stichting in which a real party in interest defense was deemed waived, since in those cases the issue was not raised until trial had commenced. Cf. Richardson v. Edwards, 127 F.3d 97, 99 (D.C.Cir.1997) (deeming real party in interest defense waived when not raised until appellate proceedings); Hefley v. Jones, 687 F.2d 1383, 1386-88 (10th Cir.1982) (deeming real party in interest defense waived when not raised until sixteen days before trial).
 
 
 40
 Moreover, Stichting has pointed to no prejudice that it has suffered as a result of defendants' delay in raising the real party in interest issue as a ground for dismissal. Stichting was able to obtain, from Saybolt NA and Saybolt, Inc., the statement of Certification. And, given that the Certification gave every indication that, even if the companies had been approached earlier, they would not then have consented to be substituted for or joined as plaintiffs with Stichting, Stichting's failure to obtain substitution or joinder of the Saybolt entities is not due to the defendants' delay. Under these circumstances, we do not think that the district court abused its discretion in determining that the defendants' standing and real party in interest objections had not been waived.
 
 2. New Jersey Law of Assignment
 
 41
 Stichting next argues that the district court erred in determining that New Jersey law would, if applicable, prohibit the claim assignments. Under New York choice of law rules, which in this diversity action we must apply, see Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Gilbert v. Seton Hall University, 332 F.3d 105, 109 (2d Cir.2003), a preliminary inquiry "in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." Matter of Allstate Insurance Co., 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). Since it is conceded that under New York law the assignments would be valid,[5] Stichting's position on New Jersey law would, if correct, obviate the need for further choice of law inquiry.
 
 
 42
 Although the issue is not pellucid, we conclude that, were we to decide the case under New Jersey law, the assignment of the legal malpractice claim to Stichting would be barred. There is no decision of the Supreme Court of New Jersey that squarely addresses the assignability of professional malpractice claims. There seems, however, to be a long-standing consensus among New Jersey state courts that, for reasons of public policy, tort claims generally are not assignable. See, e.g., East Orange Lumber Co. v. Christian Feiganspan, 120 N.J.L. 410, 412, 199 A. 778 (N.J.Sup.Ct.1938) (holding that common law rule of non-assignability applied in New Jersey), aff'd, 124 N.J.L. 127, 10 A.2d 732 (1940); Village of Ridgewood v. Shell Oil Co., 289 N.J.Super. 181, 195, 673 A.2d 300 (N.J.Super.Ct.App.Div.1996) (stating that in New Jersey "[a] tort claim cannot be assigned prior to judgment" and applying the principle in personal injury, trespass, and nuisance context); Costanzo v. Costanzo, 248 N.J.Super. 116, 122, 590 A.2d 268, 271 (1991) (applying the principle in personal injury context); see also Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487, 490 (3d Cir.1997) (holding that New Jersey law prohibits prejudgment assignment of tort claims, including intentional torts). Moreover, it appears clear that, under New Jersey law, legal malpractice claims sound in tort. See Grunwald v. Bronkesh, 131 N.J. 483, 492, 621 A.2d 459 (1993). Taking these two principles together, New Jersey federal district courts have on two occasions concluded that the general ban on assignment of tort claims in New Jersey renders professional malpractice claims unassignable under New Jersey Law. See Alcman Services Corp. v. Samuel H. Bullock, P.C., 925 F.Supp. 252, 257-58 (D.N.J. 1996); Conopco, Inc. v. McCreadie, 826 F.Supp. 855, 866-67 (D.N.J.1993).
 
 
 43
 Stichting urges this court to rely upon Kimball International, Inc. v. Northfield Metal Products, 334 N.J.Super. 596, 760 A.2d 794 (N.J.Super.Ct.App.Div.2000), for the proposition that the New Jersey bar on assignment of tort claims extends only to personal injury actions. The question of the scope of New Jersey's bar on assignments was not, however, squarely before the court in Kimball, which concluded on the facts before it that the assigned claim at issue was contractual, rather than tortious, in nature—and was therefore clearly assignable under New Jersey law. Id. at 612-13, 760 A.2d 794. The Kimball court did state, in dicta, that "recent cases have indicated that the non-assignability rule applies only to tort claims for personal injuries," and that such a limitation on non-assignability is consistent with the law of other jurisdictions. Id. at 613 n. 6, 760 A.2d 794. That statement, however, was supported by citation only to intermediate courts of review in New Jersey, and did not cite to, or account for, the much broader statements of prohibition contained in the line of New Jersey cases extending from East Orange Lumber. Under these circumstances, we cannot accept Stichting's invitation to rely upon Kimball as an indicator of the contemporary trend in New Jersey law.[6] We hold that New York law, which allows such assignments, and New Jersey law, which does not, are irremediably different, and therefore that, on this basis, we cannot avoid reaching the choice of law issue.
 
 
 44
 We conclude that, if the issue were before the New Jersey Supreme Court, it would hold that Stichting's legal malpractice claim would not be assignable.
 
 3. The Effect of Fed.R.Civ.P. 17(a)
 
 45
 Stichting's final argument against the necessity of this court reaching the choice of law question is that, even if New Jersey law applies to this action and bars assignment of the malpractice claim, the district court erred in not allowing Stichting to rely upon Saybolt NA and Saybolt, Inc.'s ratification of and joinder in the action, in accordance with Fed.R.Civ.P. 17(a). We agree with the district court that the procedures set forth in Rule 17(a) are inapposite in situations where the real party in interest defect is created by lack of compliance with state substantive law, and that application of Rule 17(a) in such circumstances would effect an impermissible enlargement, through the Federal Rules, of state substantive rights. See 28 U.S.C. § 2072(b).
 
 
 46
 Federal Rule of Civil Procedure 17(a) requires that "[e]very action shall be prosecuted in the name of the real party in interest." The rule goes on to provide, in pertinent part, as follows: No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.
 
 
 47
 Fed.R.Civ.P. 17(a).
 
 
 48
 The requirements of Rule 17(a) show the difficulties, in diversity cases, that flow from the interaction between state substantive requirements and federal procedural requirements. See generally Hanna v. Plumer, 380 U.S. 460, 472-74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (holding that the Federal Rules must supersede a conflicting state rule that is implicated by the court's diversity jurisdiction); id. at 476, 85 S.Ct. 1136 (Harlan, J., concurring) (noting that the majority approach requires application of the Federal Rules where the state rule is "arguably procedural"). Wright and Miller describe the effect of Rule 17(a) as requiring "that the action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right." 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1543 (2d ed. 1990) ("Wright & Miller"). And we have in prior cases emphasized that, while the question of in whose name a suit must be brought is procedural, that question must be answered with reference to substantive state law. See Ocean Ships, Inc. v. Stiles, 315 F.3d 111, 116 n. 4 (2d Cir.2002) ("Because state law `controls the underlying substantive right of an insured to recovery,' `state-law questions may arise in determining what interest [a party] actually has.'" (quoting Brocklesby Transport v. Eastern States Escort Services, 904 F.2d 131, 133 (2d Cir.1990),[7] and Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 125 n. 22, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968)); Neilson v. Colgate-Palmolive Co., 199 F.3d 642, 650 (2d Cir.1999) (observing that New York law provided source of right for a legal guardian to proceed as the real party in interest in an action to benefit his or her ward); see also Wright & Miller § 1544 ("[S]tate law will control in an action based on diversity of citizenship for purposes of ascertaining who possesses the original cause of action or deciding a question relating to assignability."); id. § 1545 ("[T]he question whether a party purporting to hold an assigned claim is a real party in interest ultimately rests on the substantive law governing the assignability of the particular chose in action.").
 
 
 49
 We must, therefore, look to applicable state law to determine whether Stichting properly possesses the right of action that it asserts in this case. As has already been stated, there is no dispute that, if New York law governs, the assignments that culminated in Stichting's possession of the claim here asserted would be proper. If, however, New Jersey law governs, the assignments were invalid, and Stichting does not possess a right of action.
 
 
 50
 Furthermore, ratification, which Stichting purported to obtain from Saybolt NA and Saybolt, Inc., cannot cure the defect. The procedural mechanisms set forth in Rule 17(a) for ameliorating real party in interest problems may not, under the Rules Enabling Act, 28 U.S.C. § 2072(b), be employed to expand substantive rights. See Del Re v. Prudential Lines, Inc., 669 F.2d 93, 96-97 (2d Cir. 1982). Nor is this a situation like that presented in Advanced Magnetics where a purported assignment of action was rendered ineffective by a technical defect in the assignment agreement. 106 F.3d at 17-18. In that case, we held that it was an abuse of discretion for the district court not to allow the plaintiff the opportunity to amend the complaint to join the additional parties whose rights of action had not properly been transferred. Id. at 20. Here, however, the asserted defect in the assignment arises as a result of state law that prohibits the transfer of rights now claimed by Stichting. In such a situation, ratification under Rule 17(a) would allow Stichting to accomplish through operation of the Federal Rules precisely what it could not accomplish under New Jersey law. This, the district court properly determined, is not permitted.
 
 
 51
 Stichting argues that even if ratification is not available to it, any real party in interest problem is cured by the joinder of the Saybolt entities as nominal defendants in the second amended complaint. This, however, runs contrary to the plain language of Rule 17(a), which requires that an action be "prosecuted" by the real party in interest. As the Certification obtained from Saybolt NA and Saybolt, Inc. made clear, Stichting is the only entity with any intention of prosecuting this action, and, under the circumstances here, bringing the Saybolt entities into the action nominally or involuntarily would, like ratification, simply be an end-run around New Jersey's assignment ban.
 
 
 52
 To the extent that the action may be governed by New Jersey law, the district court did not abuse its discretion in concluding that the procedures set forth in Rule 17(a) could not be utilized to cure Stichting's real party in interest problem. Accordingly, whether New Jersey law or New York law governs the validity of Stichting's assignment is dispositive of whether the action may proceed.
 
 
 53
 C. New York law does not supply a clear answer
 
 
 54
 Having concluded that the choice of law issue posed by this case is in fact determinative, we turn now to an assessment of how the New York Court of Appeals would decide the choice of law question and whether, therefore, New York or New Jersey law governs this action. The fact that we are unable to glean from the current body of New York law a clear answer to that question leads us to certify the issue.
 
 
 55
 As has already been stated, we apply, in diversity cases, the choice of law rules of the forum state, in this case, New York. See Klaxon, 313 U.S. at 496-97, 61 S.Ct. 1020; Gilbert, 332 F.3d at 109. Thus, "[o]ur task is to determine what law New York courts would apply in this situation." O'Rourke v. Eastern Air Lines, Inc., 730 F.2d 842, 847 (2d Cir.1984), abrogated on other grounds, Salve Regina College v. Russell, 499 U.S. 225, 230, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).
 
 
 56
 New York courts confronted with a choice of law issue in torts conduct an "interest analysis," assessing which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue. Padula v. Lilarn Properties Corp., 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994). Where the conflict concerns a loss-allocating rule—one that "prohibit[s], assign[s], or limit[s] liability after the tort occurs," id. at 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001—rather than a conduct-regulating rule, the interest analysis is conducted with reference to the principles set forth in Neumeier v. Kuehner, 31 N.Y.2d 121, 127-29, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972). See Cooney v. Osgood Machinery, Inc., 81 N.Y.2d 66, 76, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) (applying Neumeier rules in conflict analysis involving law of contribution); Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 199-202, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (applying Neumeier rules in conflict analysis involving charitable immunity); Elson v. Defren, 283 A.D.2d 109, 115-16, 726 N.Y.S.2d 407 (1st Dep't 2001) (applying Neumeier rules in conflict analysis involving vicarious liability principles). A rule pertaining to the assignability of a tort claim is unquestionably loss-allocating, and therefore we apply the Neumeier framework to determine what law governs the issue.
 
 
 57
 Neumeier sets forth three rules to guide the court's choice of the relevant interests at stake for choice of law analysis. The first applies when the parties share a domicile; the second applies when the parties are domiciled in different states and the law of each state is favorable to its respective litigant; and the third is applicable to all other split-domicile cases. See Neumeier, 31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454. Because in this case Stichting, Schreiber, and Walter, Conston do not share a domicile, and because the laws of relevant domiciles do not favor the respective domiciliaries, the third Neumeier rule applies.[8] Pursuant to that rule, the law of the place of the tort will apply, unless displacing it "will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants." Id. at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454 (internal quotation and citation omitted).
 
 
 58
 Here, while it is true that tortious conduct is alleged to have occurred in multiple places—a factor that will be considered in due course—New Jersey is essentially the locus of Stichting's injury, because most of the allegedly negligent advice was received by Saybolt there, and because Saybolt was prosecuted there. See Schultz, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 (noting that where tortious conduct and injury occur in different jurisdictions, the place where the plaintiff's injuries occur is the relevant "locus" for choice of law purposes). It is therefore the law of New Jersey that should control, unless it can be shown that application of New York law— the only competing jurisdiction at issue— "will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants." Id. at 201, 491 N.Y.S.2d 90, 480 N.E.2d 679 (internal quotation and citation omitted).
 
 
 59
 The district court in this case concluded that New Jersey law should apply, ruling at oral argument that, "while there is some argument for New York law, the overwhelming contacts, relevant contacts under New York choice of law provisions are with New Jersey and there is not a sufficient policy reason for New York to override what would otherwise be the normal operation of its choice of law provision." We disagree with the conclusion of the district court, to the extent that we do not think that it can so clearly be determined that New Jersey's interest in seeing its law applied predominates over New York's interest in the same.
 
 
 60
 It is true, as the district court observed, that New Jersey's contacts with the tortious activity alleged in this action are more numerous, and substantial, than New York's. New Jersey was the site of the principal offices of both Saybolt Inc. and Saybolt NA. It also was the principal place in which Schreiber's advice regarding the Panamanian transaction was either given or received: The November meetings took place in New Jersey, and Dunlop and Mead both were located in their New Jersey offices during at least some of the December telephone conversations with Schreiber concerning the transaction. As for New York, it is the state in which Walter, Conston is registered as a professional corporation and in which its office is located, as well as the only state in which Schreiber is admitted to practice as an attorney. There is also evidence that Schreiber met with Saybolt representatives at the Walter, Conston office on more than one occasion. These New York-based contacts, however, bear a comparatively thin connection to the conduct that is at issue in this action.
 
 
 61
 The question is closer, however, when the substantive legal interests of the two jurisdictions are examined. As to New Jersey's interest in prohibiting assignment of tort claims, an examination of case law addressing the question does not yield a clear statement regarding the nature of the public policy that such assignments violate. Kimball appears to be alone in offering a rationale for the bar, relying upon a Fourth Circuit decision for the proposition that the purpose of the rule was "`to prevent unscrupulous strangers to an occurrence from preying on the deprived circumstances of an injured person.'" Kimball, 334 N.J.Super. at 611, 760 A.2d 794 (quoting Caldwell v. Ogden Sea Transp., Inc., 618 F.2d 1037, 1048 (4th Cir.1980)). However, early cases addressing the issue imply that the origins of the rule were simply property law doctrines that prohibited the assignment of future interests, see Weller v. Jersey City, H & P St. Ry. Co., 28 N.J.L.J. 659, 662, 68 N.J. Eq. 659, 61 A. 459 (1905) ("A right of action for personal injuries cannot be made the subject of assignment before judgment. In the absence of a statutory provision to the contrary, nothing is assignable, either in law or equity, that does not directly or indirectly involve a right to property." (quotation and citation omitted and emphasis added)), combined with a persistent legislative failure to authorize, by statute, the assignment of actions in tort, see East Orange Lumber, 120 N.J.L. at 413, 199 A. 778 (noting that "[i]n most states where an action for damages arising in tort are held assignable, there is some statutory provision making the change," and holding that "the rule [barring assignment of tort actions] being so firmly embedded in our jurisprudence it will be necessary for the legislature, if it sees fit, to alter the same").
 
 
 62
 These early cases, which are still relied upon by New Jersey courts for the proposition that assignment of tort actions violates the public policies of the state, see, e.g., Village of Ridgewood, 289 N.J.Super. at 195, 673 A.2d 300 (citing East Orange Lumber); Amato v. Amato, 180 N.J.Super. 210, 217, 434 A.2d 639 (N.J.Super.Ct.App.Div.1981) (citing, inter alia, Weller and East Orange Lumber for the proposition that "[t]he nonassignability of a right of action for tortious personal injury, because it is not a property right, is an ancient concept of the common law recognized in this State" (emphasis added)), do not point to a strongly held policy interest that New Jersey might have in seeing the assignment bar applied. Moreover, to the extent that the Kimball court's reasoning is an accurate representation of the policy concerns behind the bar, the instant case does not strongly implicate an interest in protecting potentially vulnerable assignors. The assignments in question indisputably occurred as a result of arms-length business transactions, and the assignees—in the case of both the Saybolt shareholders, who first received the claims, and Stichting, which now asserts them—all bear a direct relationship to the injured party. And, as to New Jersey's general interest in having its law apply to litigation arising from injuries suffered within its borders, the New York Court of Appeals has emphasized that where loss allocation rules are concerned, the jurisdiction in which the injury occurs "has at best a minimal interest in determining the right of recovery or the extent of the remedy." Schultz, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679.
 
 
 63
 As to New York, neither party has pointed us to an overriding policy motivation behind the state's permissive attitude toward the assignment of tort actions in general, and of legal malpractice actions in particular; nor have we located any statement in this regard from the New York courts. It may well be that whatever New York's interest in allowing such assignments, it is not implicated—either positively or negatively—in a case involving claims accruing by injury to a New Jersey-domiciled company, and owned by a Dutch parent. On the other hand, depending upon the strength of New York's interest in its liberal approach to claim assignability, and in light of the presence of a New York corporation as a defendant in this action, New York may have a cognizable interest in seeing this case proceed.
 
 
 64
 Moreover, New York has an additional interest at stake in this action, related to Schreiber and Walter, Conston having registered legal practices within the state. To the extent that New Jersey's bar on the assignment of this action would, in this case, prevent Schreiber and Walter, Conston from being held accountable for their allegedly negligent professional conduct, New York's interest in upholding the integrity of its bar would be compromised.[9]
 
 
 65
 New York choice of law cases do not give much guidance with respect to situations where an analysis of the contacts and the interests of the competing jurisdictions suggest conflicting results. It has been said that, "[a]ssuming that the interest of each State in enforcement of its law is roughly equal ... the situs of the tort is appropriate as a `tie breaker' because that is the only State with which both parties have purposefully associated themselves in a significant way." Cooney, 81 N.Y.2d at 74, 595 N.Y.S.2d 919, 612 N.E.2d 277. It is not at all clear, however, that this principle, which would counsel in favor of application of New Jersey law, applies in a situation such as that presented here, where the contacts and the interests pertaining to each jurisdiction appear to line up on separate sides of the balance sheet.
 
 
 66
 Additionally, New York courts have given what appears to be conflicting treatment to a factor that arguably is relevant in this case, protection of party expectations. The New York Court of Appeals in Miller v. Miller, 22 N.Y.2d 12, 20, 290 N.Y.S.2d 734, 237 N.E.2d 877 (1968), specifically rejected the suggestion "that the choice of applicable law in this tort action should be determined on the basis of the expectations of the parties as derived from their contact with the State of the place of the accident." The Court noted that the notion that parties relied upon the application of one or another state's law to their disputes was "an obvious fiction having little to do with laws in conflict." Id. In Cooney, however, the Court of Appeals suggested that, in certain circumstances, protection of the "reasonable expectations" of the parties might, "at times," be an appropriate factor in choice of law analysis. 81 N.Y.2d at 77, 595 N.Y.S.2d 919, 612 N.E.2d 277. In Cooney, the Court noted that this factor supported its decision to apply Missouri law, instead of that of New York, but did so in the course of observing that the defendant had done "nothing to affiliate itself with Missouri." Id. Such cannot be said here with respect to the defendants: Schreiber, of course, purposely affiliated with New Jersey, and New Jersey domiciliaries, on a number of occasions, and Walter, Conston, for its part, is alleged to be answerable for that conduct through vicarious liability.
 
 
 67
 The plaintiff, however, may be said to have some reasonable reliance interest, albeit of a different sort, regarding the enforceability of its claim. Stichting received its assignment of claim subsequent to an arms-length business transaction in which a corporate entity sought both finality for itself and satisfaction for its shareholders. There are strong indications that that corporation, a Dutch entity, had every expectation that its assignment of claim would be effective. The same can be said of the Saybolt BV shareholders' assignment of claim to Stichting, also a Dutch entity. It is certainly true that the events giving rise to this action have substantial contacts with the state of New Jersey. But the post-tort posture of the Dutch parent corporation and the Saybolt BV shareholders—which is the point in time when the loss-allocation rule here at issue became relevant—arguably was such that there would be no expectation that New Jersey law prohibiting assignment of claim—as against New York's rule allowing it—would apply to their conduct. Whether Cooney's reliance on the total absence of contacts with a given jurisdiction indicates a necessary condition for looking to parties' "reasonable expectations" in a Neumeier analysis, or whether, instead, there are sufficient factors present here to conclude that the extent to which the parties' expectations would be undermined militates against application of New Jersey law to invalidate Stichting's assignment, is a question that we do not find clearly answered by the New York courts.
 
 
 68
 Thus, we believe that, quite apart from the unique factual setting of this case, the issues it raises with respect to application of the third Neumeier choice of law rule are likely to recur in future cases. As a general matter, situations in which analyses of the interests of and contacts with the competing jurisdictions suggest conflicting results, and where deference to the law of the situs of the tort may further none of the interests assessed, would appear to be highly susceptible of repetition. Relatedly, it remains to be clarified under what circumstances and to what extent protection of parties' "reasonable expectations" plays into choice of law analysis under the third Neumeier rule.
 
 
 69
 Finally, as has already been stated, the dismissal of this action, after nearly five years of litigation, turns upon resolution of these novel and difficult New York choice of law questions. We therefore think that the prudent course is to give the New York Court of Appeals the opportunity to decide whether New Jersey or New York law applies to the question of the validity of Stichting's assignment.
 
 II. The Summary Judgment Motions
 
 70
 As stated above, Schreiber and Walter, Conston moved not only for dismissal of this action, but also for summary judgment on liability grounds. Schreiber's motion contended that no genuine issue of fact had been raised as to Saybolt's reliance on his advice in connection with the Panamanian bribe. Walter, Conston argued that no apparent authority relationship existed between it and Schreiber, and that therefore it was not vicariously liable for Schreiber's actions. We affirm the district court's denial of Schreiber's motion, and certify to the New York Court of Appeals the underlying substantive question of law presented by Walter, Conston's motion.
 
 A. Standard of Review
 
 71
 We review de novo the district court's grant of summary judgment, construing the evidence in the light most favorable to the non-moving party. Carney v. Philippone, 332 F.3d 163, 167 (2d Cir.2003). Summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 B. Schreiber's Summary Judgment Motion
 
 72
 Schreiber contends that Stichting has presented no genuine factual issue as to Schreiber's advice being the proximate cause of Saybolt's injuries. He claims that Mead's criminal conviction for violating the FCPA—in light of the jury's finding that in authorizing the Panamanian bribe Mead both acted intentionally and did not actually believe that the bribe was legal—requires the conclusion that Schreiber's advice was irrelevant to Mead's actions. Additionally, Schreiber points to the fact that Pluimers, who had the ultimate authority to approve the illegal payment, invoked the Fifth Amendment in the course of his deposition on this matter. Schreiber argues that Pluimers' assertion of his privilege against self-incrimination gives rise to the negative inference that his decision to authorize the bribe was also not based on Schreiber's advice.
 
 
 73
 In Stichting I, we held that, because Saybolt and Mead were not in privity with each other at the time of Mead's criminal trial, Stichting was not collaterally estopped from relitigating the issue of whether Mead believed the payment of the Panamanian bribe to have been legal. Stichting I, 327 F.3d at 184. We abide by the holding of Stichting I, and therefore think it clear that Stichting is entitled to put forth, in this proceeding, any evidence tending to establish Saybolt's reliance—through its principals, Mead and Pluimers—on Schreiber's advice. What Stichting I does not necessarily resolve, however, is the question of what quantum of evidence can create a genuine issue of fact in this regard, given that a criminal jury concluded beyond a reasonable doubt that Mead did not rely on the advice of counsel in authorizing the Panamanian payment. The evidence proffered by Stichting on the question of Mead's reliance consists primarily, if not exclusively, of Mead's own assertions—made during his deposition in this case—that he believed the Panamanian transaction to have been legal, and that if he had been advised to the contrary he would not have authorized payment of the bribe. While these assertions contradict the finding of the criminal jury, Mead's own statements were not considered by that jury, since he did not testify.
 
 
 74
 Stichting may well face an uphill battle in persuading the civil jury in the instant case to credit Mead's alleged ignorance of the illegality of the Panamanian bribes. But to resolve at the summary judgment stage, and before Mead testifies, the question of whether a reasonable jury might believe Mead would, we think, amount to a credibility determination that we are not entitled to make. See R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58 (2d Cir.1997) ("[E]ven where the surrounding circumstances indicate what has been termed, perhaps unfortunately, `implausibility,' at the summary judgment stage the court should not `weigh' the evidence in the same manner as a trier of fact."); Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment." (internal citations omitted)).
 
 
 75
 As to Pluimers, it certainly is unlikely, in light of his legal situation, that he will add anything of value to Stichting's case. Indeed, to the extent that his deposition is offered into evidence at trial, the defendants may be entitled to an instruction that the jury may draw adverse inferences against Pluimers on each question as to which he asserted his Fifth Amendment privilege during the deposition. Cf. LiButti v. United States, 107 F.3d 110, 123-24 (2d Cir.1997) (setting forth factors relevant to a determination of whether an adverse inference may be drawn on the basis of a non-party's invocation of his or her Fifth Amendment privilege). Even assuming that a jury might draw such inferences, however, we are required at summary judgment to draw all reasonable inferences in favor of the non-moving party, i.e., Stichting. Doing so, we cannot conclude that Pluimers's silence resolves all genuine issues of fact on the question of Saybolt's reliance on Schreiber's advice.
 
 
 76
 Therefore, Schreiber's motion for summary judgment was properly denied.
 
 
 77
 C. Walter, Conston's Summary Judgment Motion
 
 
 78
 We cannot, however, deal as summarily with Walter, Conston's summary judgment motion. For if New York law applies to this action, the question of whether Walter, Conston may be held liable for the acts of Schreiber presents important and unsettled questions of New York agency law that we certify to the New York Court of Appeals.
 
 
 79
 Stichting alleges that Walter, Conston is liable for Schreiber's asserted malpractice on the basis of apparent authority. Although the New York courts have not addressed the scope of the doctrine of apparent authority in the context of of-counsel agreements, the general contours of the doctrine are well-established. A principal may be bound by the actions of an agent on the basis of apparent authority only where it is shown that a third party—here Saybolt—reasonably relied upon the misrepresentation of the agent "because of some misleading conduct on the part of the principal." Hallock v. State, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984) (emphasis added and internal quotation and citation omitted); see also Indosuez International Finance B.V. v. National Reserve Bank, 98 N.Y.2d 238, 245-46, 746 N.Y.S.2d 631, 774 N.E.2d 696 (2002). Thus, irrespective of the representations made by the agent—here, Schreiber—and relied upon by the third party—here, Saybolt—there must also be demonstrated some reliance nexus between the principal—Walter, Conston—and that third party.
 
 
 80
 It is undisputed that Walter, Conston never itself had direct contact with Saybolt or its employees, independently of Schreiber's activities. Nevertheless, Walter, Conston did have contact with the public at large, in the form of its advertisements, publications in legal directories, and other modes of communication, and through several of these media the firm did represent that it had an of counsel relationship with Schreiber. Additionally, Walter, Conston, in the Of Counsel Agreement, authorized Schreiber to "establish an office in Fairfield, Connecticut," "function... as ... the general counsel of a limited number of ... personal business clients," and do "some legal work of a specific nature for such clients." Schreiber was also authorized by Walter, Conston to "use the title `of counsel' . . . as it directly relates to ... [his] client development activity on behalf of [him]self." Thus, Walter, Conston not only held out Schreiber as affiliated with the firm, but it also may be said to have had at least a generalized knowledge that Schreiber would make use of this affiliation in the course of his personal legal and business dealings.
 
 
 81
 The harder question is whether there is any record evidence that Saybolt relied upon Walter, Conston's representations, as opposed to those of Schreiber, in the course of the events that are the subject of this action. There is some evidence in the record that the Saybolt board of directors made the decision to retain Schreiber, at least in part, on the basis of their understanding that he retained an affiliation with Walter, Conston. Notwithstanding Mead's deposition testimony that he knew that Schreiber maintained an independent practice that was separate from Walter, Conston, and evidence that Mead and others were aware that Saybolt compensated Schreiber at a rate that was lower than what Walter, Conston charged for Schreiber's services, Mead did testify that in recommending that Schreiber be hired as a director he placed "a lot of weight" on the relationship with Walter, Conston, and stated that he was under the impression that Schreiber consulted with his Walter, Conston colleagues on issues pertaining to Saybolt. And Schreiber himself testified that Mead and others came to the Walter, Conston offices for meetings, and also that at times they directed communication to Schreiber there. Whether this evidence is sufficient to raise a triable issue regarding Saybolt's reliance on Walter, Conston, depends in large part on the significance that New York law places upon the firm's public representations regarding its affiliation with Schreiber and the terms of its of-counsel arrangement with him.
 
 
 82
 The parties have pointed us to various decisions of non-New York courts that expressly address the issue of the degree of relationship required to be shown between a law firm and a client of an attorney of that firm who is affiliated only in an "of counsel" capacity. See, e.g., Hart v. Comerica Bank, 957 F.Supp. 958, 978-79 (E.D.Mich.1997) (holding that triable issues existed as to apparent authority given by law firm where, notwithstanding that it had no relationship to the plaintiff-client of an "of counsel" attorney, the attorney utilized firm letterhead, offices, and other resources in connection with representation of the plaintiff); Homa v. Friendly Mobile Manor, Inc., 93 Md.App. 337, 364, 612 A.2d 322 (1992) (holding that where there was no evidence that the law firm knew of the plaintiff-client, and no evidence that the plaintiff relied upon the relationship to the law firm in hiring the attorney, no triable issue existed as to apparent authority).
 
 
 83
 New York courts, however, seem never to have addressed squarely the issue of apparent authority in the context of the relationship between an of-counsel attorney and his or her firm—the sort of relationship that existed between Schreiber and Walter, Conston. The case closest to the point may be Bankers Trust Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro, 187 A.D.2d 384, 590 N.Y.S.2d 201 (1st Dep't 1992) (mem.). The Bankers Trust court stated that "the firm may be chargeable with [the attorney's] knowledge if it clothed him with the apparent authority to act on its behalf," and noted that "[e]vidence was presented that [the attorney] was listed as a member of the firm and then as `of counsel' during the period in question." Id. at 385, 590 N.Y.S.2d 201. But it is not clear whether it was the of-counsel relationship between the attorney and the firm, rather than evidence that the firm itself was actually aware of the negligent conduct of that attorney, that raised triable issues of fact in Bankers Trust. Id. Therefore, the case does not give us adequate guidance as to whether Walter, Conston's of-counsel affiliation with Schreiber suffices to give rise to the possibility of apparent authority.
 
 
 84
 Because this issue appears to be unaddressed by the New York courts, and also raises important concerns pertaining to New York state regulation of the legal profession, we deem it prudent to certify to the New York Court of Appeals the question of whether, if New York law applies to this action, triable issues of fact existed as to Walter, Conston's liability under a theory of apparent authority for the alleged malpractice of Schreiber.
 
 
 85
 In this regard, we underscore that whether New York law of apparent authority permits liability for Walter, Conston has a significant bearing on the choice of law issue as well. To the extent that material issues of fact exist as to Walter, Conston's liability for Schreiber's relationship with Saybolt, New York's interest in seeing its law, favoring assignability of legal malpractice actions, applied to this action is heightened. The interconnection in this case between choice of law and vicarious liability is an additional reason why we deem it appropriate to certify both issues to the New York Court of Appeals.
 
 CONCLUSION
 
 86
 Two important and determinative issues of state law are at play in this case. Both raise heretofore unaddressed, recurring legal questions, and important public policy considerations. Therefore, pursuant to Second Circuit Local Rule § 0.27 and New York Court of Appeals Rule § 500.17, we certify the following two questions to the New York Court of Appeals: 1) Does New Jersey or New York law apply to the question of whether the assignment of a legal malpractice claim in this case is valid; and 2) did an apparent authority relationship exist between Schreiber and Walter, Conston for purposes of Schreiber's representation of Saybolt NA and Saybolt, Inc.? The Court of Appeals may, of course, reformulate or expand upon these questions as it wishes.
 
 
 87
 It is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals, or once that court declines certification. Finally, we order the parties to bear equally any fees and costs that may be requested by the New York Court of Appeals.
 
 CERTIFICATE
 
 88
 The following questions are hereby certified to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and 22 N.Y. C.R.R. § 500.17, as ordered by the Court of Appeals of the Second Circuit:
 
 
 89
 1) Does New Jersey or New York law apply to the question of whether the assignment of a legal malpractice claim in this case is valid?
 
 
 90
 2) Did an apparent authority relationship exist between Schreiber and Walter, Conston for purposes of Schreiber's representation of Saybolt NA and Saybolt, Inc.?
 
 
 
 Notes:
 
 
 [1]
 Schreiber and Walter, Conston also moved for summary judgment on independent grounds dealing with malpractice liability and apparent authority. Before dismissing Stichting's claims, the district court denied these individual summary judgment motions
 
 
 [2]
 Saybolt BV, Saybolt NA, and Saybolt, Inc. will be referred to collectively as "Saybolt," and Saybolt, Inc. and Saybolt NA will be referred to jointly as "the Saybolt entities."
 
 
 [3]
 The district court's rulings refer to "Saybolt Inc." as the real party in interest whose ratification would be sought by Stichting. We note that it is not entirely clear whether the real party in interest would in fact be Core, Saybolt BV, Saybolt NA, or, as the district court stated, Saybolt, Inc. The record reveals no discussion, dispute, or analysis as to this issue. As resolution of this point is not raised on appeal, and is not necessary to a decision in the issues before us, we do not explore it further
 
 
 [4]
 In addition to the legal malpractice claim, the court also dismissed the legal fiduciary duty claim on the ground that it was essentially a restatement of the malpractice cause of action, and the breach of contract claim, on the ground that under New Jersey law a claim for malpractice sounds only in tort, and not contract. Stichting did not appeal the dismissal of its contract action
 
 
 [5]
 There appears to be no authority from the New York Court of Appeals directly addressing this issue, but the intermediate New York State courts have routinely upheld the assignability of legal malpractice actionsSee, e.g., Tawil v. Finkelstein Bruckman Wohl Most & Rothman, 223 A.D.2d 52, 55-56, 646 N.Y.S.2d 691 (1st Dep't 1996); Chang v. Chang, 226 A.D.2d 316, 316, 642 N.Y.S.2d 628 (1st Dep't 1996). The New York Court of Appeals is, of course, free to address this issue if it chooses to accept the questions we certify to it.
 
 
 [6]
 The existence of theKimball case together with its asserted reliance on the law of other states does suggest that New Jersey law may be changing in this area. And, were certification available to us, we might, if New Jersey law applied, seek guidance from the New Jersey Supreme Court on the matter. But certification of the question to the New Jersey Supreme Court is not an option, because, under Rule 2:12A-1 of that court, certification is accepted by that court only from the Third Circuit.
 
 
 [7]
 It is true, as Stichting points out, that we stated inBrocklesby that "[t]he question of which party is the real party-in-interest is procedural, rather than substantive." Brocklesby, 904 F.2d at 133. We went on, however, to state: "Therefore, in diversity cases federal law governs the issue of in whose name a lawsuit must be brought, even though state law controls the underlying substantive right. . . to recovery." Id. (emphasis added). This language makes clear that Brocklesby's reference to real party in interest as a procedural issue was not intended to mean that, under Hanna, the procedures set forth in Rule 17 supercede state law regarding who holds the substantive right of action. This conclusion is buttressed by examination of Virginia Electric and Power Co. v. Westinghouse Electric Corp., 485 F.2d 78 (4th Cir.1973), which is cited by Brocklesby in reference to the propositions just quoted. The Virginia Electric court described the interaction between Rule 17 and state substantive law as follows:
 The meaning and object of the real party interest principle embodied in Rule 17 is that the action must be brought by a person who possesses the right to enforce the claim and who has a significant interest in the litigation. Whether a plaintiff is entitled to enforce the asserted right is determined according to the substantive law. In a diversity action such as this one, the governing substantive law is the law of the state. While the question of in whose name the action must be prosecuted is procedural, and thus governed by federal law, its resolution depends on the underlying substantive law of the state.
 Id. at 83.
 
 
 [8]
 We note that Connecticut law does bar assignment of personal injury claims,Berlinski v. Ovellette, 164 Conn. 482, 489-90, 325 A.2d 239 (1973), overruled on other grounds by Westchester Fire Insurance Co. v. Allstate Insurance Co., 236 Conn. 362, 364, 672 A.2d 939 (1996), and that a recent decision of a lower Connecticut court concluded that such a bar extends to the assignment of legal malpractice claims, see Gurski v. Rosenblum, 48 Conn.Supp. 226, 243 838 A.2d 1090 (Conn. Super. Ct.2003). Notwithstanding the fact that Schreiber was domiciled in Connecticut at the time of the events relevant to this action, no party argues that Connecticut law governs the action. We do not consider the issue.
 
 
 [9]
 Although we recognize that New York's "conduct-regulating" interest in upholding its laws regarding malpractice is not at issue in this "loss-allocating" interest analysis, we read New York cases as authorizing consideration of a jurisdiction's interest in the substantive implications of loss-allocating rulesSee, e.g., Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 199-200, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985); Long v. Pan American World Airways, Inc., 16 N.Y.2d 337, 342, 266 N.Y.S.2d 513, 213 N.E.2d 796 (1965). New York's permissive rule relating to the assignability of legal malpractice actions surely correlates, at least in part, to an interest in seeing malpractice actions prosecuted, rather than dismissed.
 
 
 
 91
 SACK, Circuit Judge, concurring.
 
 
 92
 I concur in the judgment and agree with very nearly all of the panel opinion. I nonetheless offer a few words relating to our certification of questions to the New York Court of Appeals.
 
 
 93
 We have said that when addressing a question of New York law regarding which the New York Court of Appeals has not authoritatively spoken, "we must either (1) predict how the New York Court of Appeals would resolve the state law question, or, if state law is so uncertain that we can make no reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive resolution," DiBella v. Hopkins, 403 F.3d 102, 111 (2d Cir. 2005) (citing Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 344 F.3d 211, 220-21 (2d Cir.2003)). I doubt, in light of Judge Calabresi's careful exposition of the law, that "we can make no reasonable prediction" as to what the New York Court of Appeals would hold with respect to the issue that we certify regarding whether New Jersey or New York law applies to the question of whether Stichting's assignment of claims is valid.
 
 
 94
 But according to the text of Rule 0.27, which governs this process, we "may certify to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court," 2d Cir. R. 0.27 (emphasis added); see also Blue Cross & Blue Shield of New Jersey, 344 F.3d at 220-21; Prats v. Port Auth. of New York & New Jersey, 315 F.3d 146, 150-51 (2d Cir.2002). Thus our rule tells us when we "may," not "must," certify; it refers to a controlling "unsettled and significant question of state law," not to our ability to make a reasonable prediction as to what the law is. It seems to me that the rule thus gives us relatively broad discretion as to when to certify, and that there are things other than our ability to predict New York law that can inform our decision as to whether or not to do so.
 
 
 95
 In the case before us, given the available New York case law on the subject, the nature of the dispute, its now tortuous history, the additional expense to the parties in time, effort, and money should the New York Court of Appeals accept certification, and my view of the relative significance, beyond this litigation, of the legal questions we are called upon to decide, I have serious doubts as to whether we should certify the questions we do to the Court of Appeals. Affirmance of the judgment of the district court for substantially the reasons upon which it relied in dismissing the action may be the wiser course. But in the end it does seem to me to be a matter of discretion, and, although I recognize that my colleagues likely have different views than do I as to the proper basis for exercising that discretion, I am content to defer to their judgment here.